# Steiner & Lobman, *et al. v.* Atlanta Woodenware Co.

*Bill in Equity to have Attachment set aside as Fraudulent and Collusive.*

1. *Fraudulent attachment; bill to subject property attached to payment of debts; sufficiency of evidence.*—On a bill filed by creditors to have a writ of attachment and judgment rendered in the attachment suit against an insolvent debtor·declared fraudulent, and the property sold subjected to the payment of complainant's debt, the following facts appeared: The insolvent debtor, who was the father of one of ·the complainants, testified that upon his appealing for aid to the attaching creditor, stating to him that without such aid it would be necessary for him to make a general assignment, such creditor induced him to permit attachments to be sued out, and levied upon his stock of goods, representing that by so doing, said creditor would be paid his debt in full, and the result would be beneficial to the debtor; that while in the city of the residence of the attaching creditor, the latter would not allow him to see or confer with his other creditors, who resided in the same place; that said creditor went with the debtor to the town where his business was carried on, and there, after another conference, sued out writs of attachment, which were levied upon his goods, and under which same were sold, judgment having been rendered in the attachment suits; that there were no grounds for the suing out of the writs of attachment. The attaching creditor denied having induced the debtor to permit the attachments to be sued out, and contradicted the debtor as to the facts and circumstances under which the attachments were issued. Other witnesses contradicted the testimony of the insolvent debtor. *Held*: That such evidence was not sufficient to show that the writs of attachment were collusively sued out, and were insufficient to authorize a decree declaring them fraudulent and void.

APPEAL from the Chancery Court of Barbour.

Heard before the Hon. W. L. PARKS.

The purpose of this suit and the facts of the case are sufficiently stated in the opinion. Upon the final sub-

mission of the cause upon the pleadings and proof, the chancellor rendered a decree granting the relief prayed for by the complainants. From this decree the defendants appeal, and assign the rendition thereof as error.

G. L. COMER and GRAHAM & STEINER, for appellant, cited *Lehman v. McQueen*, 65 Ala. 570; *Adams v. Thornton*, 78 Ala. 489.

A. H. MERRILL, *contra*, cited *Comer v. Heidelbach*, 109 Ala. 220; *Rice v. Less*, 105 Ala. 298.

TYSON, J.—On the 14th day of April, 1898, the appellants sued out writs of attachment in the circuit court of Barbour county against L. Manasses as executor and trustee of the estate of J. Manasses, who was doing business in Clayton, upon the ground that the defendant had money, property and effects liable to satisfy his debts which he fraudulently withheld, and caused them to be levied upon a stock of goods, wares and merchandise owned by the defendant. There were judgments in favor of the plaintiffs in these suits, and the property levied upon condemned to their satisfaction. Under these judgments the property was sold and the proceeds applied to their payment and extinguishment. On the 19th day of July, 1898, the appellees filed their bill in the chancery court seeking to have the writs of attachment and the judgments declared fraudulent and a decree rendered against the appellants for so much of the money received by them from the proceeds of the sale of said property as may be sufficient to pay their debts against L. Manasses, the insolvent debtor. The sole ground of attack made by the bill upon the attachment proceedings, is, that, the writs were collusively sued out.

The only question presented by the record is, whether the evidence satisfactorily proves that there was collusion between Lobman, who was the representative of the firm of Steiner & Lobman, and Moritz & Co., and Manasses, the insolvent debtor, in the suing out of these attachments. The only witness who testifies to this fact

is L. Manasses, the insolvent debtor. He says that for several years prior to the suing out of the attachments he had been doing a mercantile business in Clayton and for some time prior thereto his business was in a failing condition. That the only property he owned was his stock of merchandise, which he says was worth about $6,000, and that he owed $8,000 of debts. That on the 13th day of April, 1898, the day before the suing out of the attachments, he went to Montgomery to see Steiner & Lobman, his largest creditors, to try to arrange with them "to pull him through," and if he failed to get their assistance, it was his intention to make a general assignment. That he saw Lobman of the firm of Steiner & Lobman, and told him that he wanted to get some money and goods, that he was "in a tight in his business," that some of his bills were due and he couldn't pay them and needed some help, and if he could get help he "would bridge over and come out all right." That if he could not get this help, he wanted to make a general assignment for the benefit of all his creditors. That Lobman told him, he would go and advise with his attorney, which he did. When Lobman came back, Manasses says, he told him that his attorney advised him that the best way was to sue out an attachment; and if he (witness) made a general assignment he would have nothing left, and Steiner & Lobman would not get their debt in full. But, if they attached the stock of goods, they would get the full amount of their debt and that he (Manasses) would have something left. Lobman said he would buy in the stock of goods at the attachment sale and sell them back to him, in some other person's name, on a credit. He agreed to this. Lobman then told him not to let any person in Montgomery see him, that they might suspect what he was there for. Accordingly, he, witness, stayed in Steiner & Lobman's store all day until four o'clock in the afternoon. That Lobman prevented him from seeing B. B. Warren & Co., to whom he was indebted, and kept him from telling them of the agreement between them. In order to consummate this agreement Lobman was to go to Clayton with him that afternoon via Midway, but afterwards said, that he

[Steiner & Lobman, *et al.* v. Atlanta Woodenware Co.]

(Lobman) had seen his attorney who advised him not to go to Clayton with witness as that would look like collusion. So it was finally agreed upon, that witness was to return to Clayton via Midway and Lobman to go by way of Ozark, another and different route. On the next morning (April 14) witness and Lobman met in Clayton, and Lobman told him that he would go and see his attorneys there and decide what he would do. Witness said to him that he was still considering making an assignment for the benefit of all his creditors. About 2 o'clock of that day Lobman, he says, sent for him to come to the banking house of the Clayton Banking Co., but not to come through the front door. Witness, however, does not remember who it was brought him this message. That he was too busy at that moment and did not go. That afterwards Lobman himself came to him at his store and told him to come over to the banking house, but to come through the back door. That he went to the bank, and Lobman met him there. That Lobman said to him, it will not do to make an assignment, and the best thing and the only way is to make an attachment. He said he preferred an attachment because the expense would not be much, and he was doing this for witness' benefit; that he would get his money and would immediately sell the stock back to him on a credit, as he had promised in Montgomery. He (witness) agreed to it a second time. He testified further that Lobman told him that after the attachment was levied, for him to see after the inventory of the goods and to see to it that the stock didn't inventory more than $3,000 or $3,500, so Lobman could buy it. That Lobman was to sell it back to him for the amounts due by him to the firm of Steiner & Lobman, Clayton Banking Co., and Moritz & Co. That Lobman was present at a sale of the goods and bid nearly as much as $3,000, but that they were bought by one Bell. That Lobman said to him while the bidding was going on, that he believed, he would let Bell have the goods and that he could furnish him (witness) a new stock of goods. Witness also testified that no grounds of attachment existed whatever.

On cross-examination this witness testified that the train arrived in Montgomery on April 13, at 10 : 35 a. m. That he went immediately to Steiner & Lobman's office. That he sat there five or ten minutes before beginning the conversation testified about. That Steiner, one of the members of the firm of Steiner & Lobman, heard all that was said between him and Lobman. That he had been in Steiner & Lobman's office about one-half hour before Lobman went out, and that during that time neither Lobman nor Steiner did any writing. That the conversations he had with Lobman in the banking house of the Clayton Banking Co. were in the presence of T. R. Parrish, the cashier of the bank, and that Parrish heard the agreement made by him with Lobman. That Parrish also attached his goods that day for a debt he owed the Banking Company, but had no understanding or agreement with him about the suing out of the attachment.

The record discloses that one of the complainants in the bill is a son of the witness, to whom he testifies he in indebted in a large sum of to-wit, $2,000. He cannot therefore be said to be a disinterested witness, and it is practically upon his testimony that the complainants must rest their case.

Lobman and Steiner both swear that no such conversation was had in their place of business and that no agreement or understanding whatever was had about the suing out of the attachments. Lobman's visit to Clayton on the 14th day of April, via Ozark, is fully explained by the letters written to his firm by Alston & Peach of date April 12th, and his telegram in reply thereto on the morning of the 14th, which shows it was received by the telegraph company for transmission at 10 :40, manifestly prior to Manasses' arrival at their office. Lobman also contradicts Manasses in every detail as to what occurred in Clayton.

Parrish does not corroborate Manasses as to the conversation which he swears was had between him and Lobman in his banking house on the afternoon of the day the attachments were levied. Parrish remembers no such agreement being made. He would be most likely

[King v. The Peoples Bank.]

to have remembered it, had it occurred as testified to by Manasses, as his bank was interested in the attachment writs which were being sued out against Manasses on that very day. So, we may say that Manasses is contradicted by him as well as by Lobman. He is also contradicted by Davie pointedly and unequivocally about another matter. And also by Judge Alston as to the circumstances under which he was permitted to retain the possession of the horse, dray and furniture. It is plain that Manasses in his testimony attempted to make the impression that the possession of these articles by him was in pursuance of the fraudulent agreement which he said Lobman made with him prior to the the suing out of the attachments. He also tries to create the impression that Parrish heard and knew all about his fraudulent agreement. His willingness, and we might say his eagerness, to enter into a fraudulent agreement to become the beneficiary of a business to be conducted in the name of another, does not recommend him to our favorable consideration.

While we recognize the importance of making it difficult for creditors, who resort to fraudulent means to secure preferences over other honest creditors of their insolvent debtor, to reap the benefit of their covinous devices, yet, we are unwilling to stamp a transaction as such, upon testimony so impugned by other witnesses as that of the witness upon which the complainants rely in this case.

The decree of the chancery court must be reversed, and one will be here rendered dismissing the bill.

Reversed and rendered.